IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| LYNCHBURG RENEWABLE FUELS, LLC, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| BIOFERM ENERGY SYSTEMS, LLC, CEI BUILDERS, TN, LLC, CALGARO CONSTRUCTION, LLC, BALMORAL TANKS, LTD and NADEEM AFGHAN, | ) ) ) ) ) ) ) |
| Defendants. | |

Case No. _____

## COMPLAINT

For its Complaint against defendants BIOFerm Energy Systems, LLC, CEI Builders, TN, LLC, Calgaro Construction, LLC and Balmoral Tanks, Ltd., and Nadeem Afghan, Plaintiff Lynchburg Renewable Fuels LLC would respectfully show to the Court as follows:

### I. INTRODUCTORY STATEMENT

1. This dispute arises under a contract between BIOFerm Energy Systems, LLC ("BIOFerm") and 3Rivers Energy Partners L.L.C. ("3Rivers"), which contract was assigned to Lynchburg Renewable Fuels LLC ("LRF"). Under the contract, BIOFerm was to construct an anaerobic digester plant for the production of renewable natural gas (the "Facility") adjacent to the Jack Daniels distillery in Lynchburg, Tennessee (the "Project"). In general terms, the Facility would receive byproducts of the Jack Daniel's distilling process via a pipeline from the Jack Daniels distillery where they would initially be stored in seven (7) tanks. The process would break these by-products down to generate methane gases recovered as biogas. A biogas upgrade plant would then remove the contaminants to produce pipeline-quality renewable natural gas (RNG) that

would be directly connected to a local natural gas utility. The Facility would also produce liquid fertilizer to be processed, stored and distributed to meet local agriculture demand.

2. As set forth more fully herein, from the outset of the project, BIOFerm repeatedly delayed progress on the Project, performed shoddy and substandard work, and failed to pay its subcontractors, while at the same time inducing payments from Plaintiff by falsely representing that BIOFerm's subcontractors had been paid.

3. The Project came to an abrupt halt on Monday, September 9, 2024, when BIOFerm began hydrotesting the storage tanks to hold the distillery's byproducts. After being filled with approximately 2.3 million gallons of water, one of the storage tanks suffered a catastrophic rupture, causing millions of gallons of water to flood the Facility and causing extensive damage to the Facility and to neighboring properties..

4. In this action, Plaintiff seek to recover from BIOFerm damages proximately caused by BIOFerm's breaches of the contract and other tortious acts more fully described herein.

## II. PARTIES, JURISDICTION AND VENUE

5. Plaintiff LRF is a Delaware limited liability company whose sole member is Lynchburg Renewable Fuels Holdings, LLC ("LRF Holdings"). The members of LRF Holdings are 3Rivers Energy Partners L. L.C. ("3Rivers") and TC Energy RNG, LLC ("TC Energy"). TC Energy's sole members is TC Entergy Development Holdings, Inc, a Delaware corporation with principal offices located in Calgary, Alberta.

6. 3Rivers is a Delaware limited liability company whose sole member is 3Rivers Energy Partners Holdings, LLC ("3Rivers Holdings"). 3Rivers Holdings is a Delaware limited liability company whose members are John Rivers, David Johnson and HOOPP RNG, Inc. HOOP RNG Inc. is a corporation organized under the laws of Ontario, Canada, with principal offices

located in Ontario, Canada. John Rivers is an adult citizen domiciled in the state of Michigan. David Johnson is an adult citizen domiciled in the state of North Dakota.

7. Defendant BIOFerm Energy Systems, LLC ("BIOFerm") is a Wisconsin limited liability company whose members are Nadeem Afghan and Arosa Capital Management ("Arosa"). Nadeem Afghan is an adult citizen domiciled in the state of Wisconsin. Arosa is a limited partnership. Its general partner is Arosa Capital Movement, LLC. Plaintiff alleges on information and belief that none of Arosa's general or limited partners are citizens of Michigan or North Dakota.

8. Defendant CEI Builders, TN, LLC ("CEI") is a Nevada limited liability company. Plaintiff alleges on information and belief that CEI's sole member is CEI Builders, LLC, a Nevada limited liability company. Plaintiff alleges on information and belief that the members of CEI Builders, LLC are residents of the state of Nevada and that none of its members are domiciled in Michigan or North Dakota.

9. Defendant Calgaro Construction, LLC ("Calgaro Construction") is a Minnesota, limited liability company. Plaintiff alleges on information and belief that Calgaro Construction's members are citizens and residents of the state of Minnesota and that none of its members are citizens and residents of the states of Michigan or North Dakota.

10. Defendant Balmoral Tanks, Ltd. ("Balmoral") is a limited company organized under the laws of the United Kingdom, with principal offices in the U.K. Balmoral is not a citizen of any state of the United States.

11. Defendant Nadeem Afghan is an adult citizen and domiciled in the state of Wisconsin and may be served with process at 3530 Blackhawk Drive, Madison, Wisconsin 53705-1906.

12. The amount in controversy exceeds the sum of $75,000.00.

13. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 as complete diversity of citizenship exists between the Plaintiff and Defendants. For the purposes of diversity jurisdiction, Plaintiff is a resident of the states of Delaware, Michigan, North Dakota and the provinces of Ontario, Canada and Alberta, Canada. No defendant is a resident of any of these states or Canada.

14. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions given rise to Plaintiff' claims occurred in this judicial district and because the parties to the relevant contract consented and agreed to litigate their disputes in this judicial district.

### III. FACTUAL BACKGROUND

The EPC Agreement

15. On May 29, 2022, 3Rivers entered into an engineering, procurement and construction contract (the "EPC Agreement") with BIOFerm. A true and correct copy of the EPC Agreement is attached as **Exhibit 1** hereto. The parties executed three (3) amendments to the EPC Agreement. Those amendments are attached as **Exhibit 1A, 1B and 1C** hereto.[1]

16. Pursuant to the EPC Agreement, BIOFerm agreed, *inter alia*, to provide adequate labor, and all materials, equipment, tools, supplies, transportation, supervision, technical and professional and other services and items necessary to complete performance of the work on the Project as described in the EPC Agreement.

---

[1] Pursuant to the provisions of Article 4 of the General Terms and Conditions of the EPC Agreement, LRF is filing concurrently herewith a motion to file the EPC Agreement and its amendments under seal.

17. On June 1, 2022, 3Rivers and LRF entered into an Assignment and Assumption Agreement pursuant to which 3Rivers assigned the EPC Agreement to LRF. The Assignment was made pursuant to, and in accordance with, section 6.4 of the General Conditions to the EPC Agreement.

18. The EPC Agreement provided for a fixed contract price of ▮. As a result, BIOFerm stood to benefit if its work on the Project was completed under budget and correspondingly it bore the risk of any cost overruns. BIOFerm's risk of cost overruns was mitigated to some extent, however, by a provision in the EPC Agreement providing for a contingency of ▮ potentially available, but only paid if the subcontractor were to provide a written indication that the price of the work, services, or materials had increased between the date of the EPC Agreement and the execution or delivery of the work.

19. Payments were to be made to BIOFerm pursuant to a schedule of milestones and upon certification by BIOFerm that such milestones had been reached. The EPC Agreement required that each application for payment be accompanied by additional documents, including lien waivers from such subcontractors in forms prescribed in the EPC Agreement.

20. BIOFerm subcontracted its work on the Project including by entering into a contract with CEI for CEI to be the "prime contractor" for the Project. Although referred to as the "prime contractor," CEI was in fact a subcontractor because it did not have a separated contract with LRF.

21. BIOFerm also entered into a contract with Balmoral for Balmoral to supply the tanks for the Project and with Calgaro Construction to erect the tanks. Because Calgaro Construction was not a known vendor to Balmoral, Balmoral required that BIOFerm permit a Balmoral representative to monitor the construction of the tanks to ensure that they were constructed in accordance with the specifications.

The Commencement of Construction

22. On September 9, 2022, LRF issued a Notice to Proceed, instructing BIOFerm to commence work on the Project. The Notice to Proceed was accompanied by a wire transfer of $9 million pursuant to the terms of the EPC Agreement. However, BIOFerm refused to proceed. Instead, BIOFerm wired back the $9 million payment, then leveraged its refusal to proceed by negotiating for a third amendment ("Third Amendment") to the EPC Agreement. A true and correct copy of the Third Amendment is attached as **Exhibit 1C**. The Third Amendment called for a "final contingency payment" of ▇▇▇▇▇▇▇, and an extension of the commencement date and the increase to the final contingency payment.

23. The Third Amendment obligated BIOFerm to submit both (1) reports of external cost that BIOFerm had incurred to date; and (2) regular projections of external costs that BIOFerm expected to incur in the future. The provision of this information was critical to LRF so that it could understand the costs being incurred to project its potential exposure to the final contingency payment under the EPC Agreement. More specifically, the EPC Agreement obligated BIOFerm to provide the following reports to LRF:

> (d) 3.2.2.4 Documentation of External Costs. "Documentation of External Costs" shall mean the documents listed below in Section 3.2.2.4. Contractor shall provide Owner with the following Documentation of External Costs:
>
> 1. On a biweekly basis, Contractor shall provide Owner with a forward-looking summary of future component orders and purchases, which are anticipated to exceed $100,000 individually, excluding any components that Contractor deems to be critical to performance parameters, critical to the Project Schedule, or proprietary in nature. Owner may promptly respond to Contractor with potential qualified alternative sources. Contractor, at its sole discretion, will have the final authority to select the component equipment source.
>
> 2. On a monthly basis, Contractor shall provide Owner a summary statement of external costs incurred to date for the Project, listed by Contractor's predefined system categories. The summary statement of external costs shall include, by system category, all external amounts committed and external amounts paid-to-date.

3. Within five Business Days of written request by the Owner, copies of all final invoices generated by the external provider of the labor, materials, or services for all external amounts committed and external amounts paid-to-date, provided that Contractor may redact any such invoices to remove any proprietary information of the Contractor.

24. After the initial delay caused by BIOFerm's refusal to proceed, BIOFerm continued to cause numerous and additional Project delays. For example, early in the Project, BIOFerm attempted to substitute an alternative tank supplier. This attempt caused BIOFerm's original tank supplier to threaten suit, forcing BIOFerm to abandon the substitution. Additional delays included delays in mobilization caused by BIOFerm's delay applying for a contractor license, delays in BIOFerm's civil scope design, delays in engineering and delays resulting from BIOFerm's failure to coordinate work with other site contractors.

25. The parties never agreed to any modifications the Project schedule.

26. BIOFerm also did not comply with its reporting obligations under the Third Amendment. Instead, BIOFerm stopped sending these reports altogether in early 2024. As a result, LRF did not know what costs that BIOFerm was incurring in connection with the Project.

<u>Discovery and Improper Materials and the Catastrophic Tank Failure</u>

27. In August 2024, BIOFerm advised Balmoral, CEI and LRF of an issue that had arisen in obtaining proper installation bolts to be used in constructing the storage tanks. BIOFerm recognized that the bolts that it had obtained were not in compliance with the specifications supplied by Balmoral. Despite being aware that the bolts were improper, BIOFerm, CEI and Balmoral failed to correct the issue and the improper bolts were used to construct the tanks.

28. By late August or early September of 2024, BIOFerm represented that it had completed the construction of seven (7) tanks on the Project. BIOFerm then arranged for a single tank to be tested by filling it with approximately 2.3 million gallons of water. On Monday,

September 9, 2024, there was a catastrophic rupture of the tank resulting in the sudden release of approximately 2.3 millions of gallons of water.

29. The release caused millions of dollars of damage to the Project and to LRF property.

30. Based upon LRF's initial investigation of the cause of the catastrophic rupture, LRF believes and aver that the rupture was caused by one or more of the following deficiencies in the work performed by BIOFerm and its subcontractors, including Calgaro Construction:

1) The use of improper and out of specification bolts used to erect the tanks;

2) Use of impact wrenches used to install bolts, which wrenches were not calibrated properly, leading to both over-torquing and under-torquing of bolts;

3) Omission of nuts all together in certain locations; and

4) Improper application of mastic around certain bolts.

<u>LRF Discovers That BIOFerm Was Not Paying Its Subcontractors</u>

31. Subsequent to the September 9 tank failure, LRF began receiving notices of non-payment from BIOFerm subcontractors. The subcontractors has been falsely told by BIOFerm that LRF had failed to pay BIOFerm according to the EPC Agreement. Some of the overdue invoices from the subcontractors were several months old. Some of them predated certain lien waivers that BIOFerm had supplied to LRF to support BIOFerm's pay applications submitted in March 2024 and July 2024, in which BIOFerm falsely represented that all subcontractors had been paid.

32. Total outstanding invoices to subcontractors with potential lien rights totaled approximately $5 million.

33. Contrary to BIOFerm's statements to its subcontractors, however, LRF was not in arrears on any payments to BIOFerm. The last milestone reached by BIOFerm was Draw 9, Major Equipment Delivery. LRF paid BIOFerm $4 million for reaching this milestone, relying on a lien waiver from BIOFerm signed by Mr. Afghan and delivered on July 11, 2024 representing that "to

date, [BIOFerm] has paid all of its subcontractors, suppliers and materialmen for any and all completed labor, delivered materials and completed services rendered" for the Project."

34. The fact that outstanding invoices to subcontractors with potential lien rights were approximately $5 million was especially alarming to LRF. The payments made by LRF to BIOFerm through Draw 9 totaled approximately ███████. If there were unpaid balances owed to subcontractors of $5 million, then the amounts already paid to BIOFerm plus this amount owed to subcontractors would already exceed the fixed contract price of $███████ despite the fact that the Project was nowhere near completion

LRF's Notice of Breach and Termination

35. On October 7, 2024, pursuant to the EPC Agreement, LRF sent a Notice of Breach to BIOFerm notifying BIOFerm that it was in material breach of the EPC Agreement due to both BIOFerm's persistent schedule delays and its failure to pay subcontractors. A true and correct copy of this Notice of Breach is attached as **Exhibit 2** hereto.

36. On October 10, 2024, LRF sent a supplemental notice of breach in which LRF advised BIOFerm that the cause of the tank failure was still under investigation, and documented an agreement between BIOFerm and LRF to suspend further breach notices or responses to breach notices until November 1, 2024. A true and correct copy of this Notice of Breach is attached as **Exhibit 3** hereto.

37. On October 17, 2024, Defendant Nadeem Afghan responded to LRF's Notices of Breach. In his response, Mr. Afghan refused to acknowledge any breach, refused to pay the unpaid subcontractors, claimed that BIOFerm had no contractual obligation to pay its subcontractors and, even more disturbingly, advised LRF that "BIOFerm has committed over $███████ in external goods and services" on the Project.

56162833 v1
58691246.1

9

Case 4:24-cv-00082-CEA-MJD   Document 1   Filed 12/24/24   Page 9 of 20   PageID #: 9

38. This response was especially alarming to LRF because, if true, it revealed to LRF that BIOFerm had spent ████████ on the Project, which was $5.1 million more than the total fixed contract price. Moreover, BIOFerm's contracted work for the Project was nowhere near complete.

39. On November 12, 2024, LRF terminated the EPC Agreement for cause based on BIOFerm's refusal to pay subcontractors and BIOFerm's persistent schedule delays. A true and correct copy of LRF's notice of termination is attached as **Exhibit 4** hereto.

40. LRF terminated the EPC Agreement pursuant to Exhibit J, Article 3, Section 3.1 of the EPC Agreement, which provides as follows:

> "The Owner may terminate this Contract (i) if the Contractor breaches the material terms or conditions of this Contract, which breach the Contractor does not commence to cure within 15 days after written notice of the breach by the Owner or does not proceed to diligently to cure thereafter, (ii) other than in connection with the Force Majeure or a Material Event, if the Contractor persistently fails to meet the Construction Schedule and does not take reasonable measures to cure such failure; or (iii) at any time. If the Owner terminates this Contract pursuant to clause (i) or (ii) above, then (x) the Owner shall promptly pay the Contractor for all Work actually performed through the date of termination, (y) the Owner shall be entitled to complete the Work, and (z) if the reasonable cost of completion of the Work exceed the Contract Price, the Contractor shall reimburse Owner for such reasonable excess completion costs so long as Owner grants to the Contractor, at the Contractor's option and during the period of completion of the Work, such authority and right of supervision over the completion of the Work that enables the Contractor to mitigate the excess completion costs. If the Owner terminates this Contract pursuant to clause (iii) above, then (aa) the Contractor shall be entitled to recover from the Owner payment for all Work performed, including overhead and profit on the Work performed, demobilization and other direct costs and expenses incurred by the Contractor as a result of such termination, but total payments to Contractor may not exceed the Contract Price, and (bb) Contractor shall be released form any and all further obligations under this Contract and any other agreement, contract, understanding or guaranty that the Contractor may have with Owner."

41. Despite BIOFerm's denial that failure to pay subcontractors was a breach of the EPC Agreement in its October 17, 2024 response to LRF's Notice of Breach, and despite having actually refused to pay the unpaid subcontractors in response to the October 7, 2024 Notice of Breach, BIOFerm apparently—the day after LRF sent its Notice of Termination on November 12,

2024—paid several invoices on November 13, 2024 that pre-dated the July 11, 2024 lien waiver that it provided to LRF to induce a draw payment of $4 million. LRF learned of BIOFerm's post-termination payments to subcontractors when it received CEI's invoice history on November 20, 2024. On December 9, 2024, BIOFerm submitted to LRF an invoice in the approximate amount of ███████, consistent with Mr. Afghan's October 17 statement that BIOFerm had committed over ███████ on the Project, well in excess of the contract price.

## IV. LEGAL CLAIMS

### COUNT I
### BREACH OF CONTRACT (AGAINST BIOFERM)

42. The allegations contained in the preceding paragraphs of this Complaint are repeated and incorporated herein.

43. The EPC Agreement is a valid, binding and enforceable contract between LRF and BIOFerm.

44. LRF performed its obligations under the EPC Agreement

45. BIOFerm first materially breached the EPC Agreement. BIOFerm's breaches include, but are not limited to:

   (a) its failure to adhere to the Project schedule and to cause repeated delays in the performance of the work;

   (b) its failure to pay subcontractors while falsely representing to LRF that its subcontractors were being paid; and

   (c) its failure to construct the Project in a good and workmanlike manner.

46. LRF has been damaged as a result of BIOFerm's breaches of the EPC Agreement. 24 months after commencement of the work and 9 months after the date that the Facility was initially projected to be in operation and producing natural gas, LRF is left with a damaged and

currently unusable Project site, and millions of dollars in liens and threats of lien filings by unpaid subcontractors and suppliers.

47. As LRF advised in its Notice of Termination, BIOFerm was obligated to take certain actions and to deliver certain items to LRF. Specifically, Exhibit F, Section 5.4 of the EPC Contract provides: "If this Contract is terminated by the Owner pursuant to Exhibit J, the Contractor will assign to the Owner (i) all of its agreements with the Subcontractors; and (ii) all of the Contractor's rights under any bonds for the Work held by any Subcontractor." LRF made demand for such items in its Notice of Termination. BIOFerm has not provided them.

48. The EPC Agreement also calls for the payment of liquidated damages by BIOFerm to LRF in the event of a delay in the achievement of substantial completion, milestone and product gas inspection milestone.

49. Section 1.2 of Exhibit F, Appendix 2, Exhibit E of the EPC Agreement provides as follows:

1) The rate of delay liquidated damages shall be 0.15% of the portion of the Contract payable upon completion of that Milestone;

2) Price payable upon completion of the delayed milestone for every complete week (seven (7) calendar dates) of delay beyond the date of Substantial Completion milestone and/or the Product Gas Injection milestone as set forth in the Contract Schedule; and

3) The delay liquidated damages total shall be capped at five per cent (5%) of the Contract Price.

50. Substantial Completion was to occur on or before November 22, 2023. That milestone was delayed 50 weeks until Notice of Termination was provided on November 12, 2024. Accordingly, LRF is entitled to liquidated damages for delay in substantial completion of

[redacted]

51. Product Gas Injection was to occur by March 22, 2024. That milestone was delayed 33 weeks until the Notice of Termination was sent on November 12. Accordingly, LRF is entitled to receive delay damages of ███████.

███████ The 5% of the Contract Price cap on the schedule delay liquidated damages will be ███████.

53. In the EPC Agreement, BIOFerm made certain guarantees to LRF regarding the performance of the facility. Specifically, EPC Agreement provides as follows:

> Subject to the conditions set forth below, the contractor will guarantee to the owner that the AD Plant will meet or exceed ninety percent (90%) of a theoretical max generation raw bio gas production based on the specifications attached hereto as Appendix 1 (the "Specifications") and that the feed stock characteristics that are set forth in Appendix B, which are based on the lab analysis completed in September 2021.
>
> The contractor will guarantee to the owner the BUP will meet the biomethane product gas qualities and specifications required for unlimited injection into the local gas grid as specified in Appendix C and will process one hundred percent (100%) of the raw bio gas produced by the above AD Plant."

EPC Agreement, Exhibit E.

54. In addition, the EPC Agreement provided for the payment of liquidated damages if the Facility failed to meet these requirements. Specifically, the EPC Agreement provided as follows:

> "If the Facility continually fails to meet the Guaranty after Contractor has used reasonable efforts to correct such failure during the six months of the Commissioning Period, then the Contractor may be required to pay liquidated damages to the Owner. Owner and the Contractor agree that the liquidated damages shall be calculated and paid over a five-year period as set forth on Appendix 2 attached hereto…The amount shall be paid as liquidated damages and not as a penalty and shall be Owner's sole and exclusive remedy for the failure of the Facility to meet the Guaranty."

Exhibit E, Process Guarantee.

55. Appendix 2 to Exhibit E of the EPC Agreement provides,

"If Contractor is no able to reach 90% (of the Condition (A)) of the Facility Guarantee after 90 days by repair of "the process and performance issue" or any other measurement such as increase and/or upgrade of system capacity or substitute the defect part(s) by non-defect or new parts, it shall be deemed that the Contractor fails to fulfill the contract, the Owner has the right to cancel the contract as permitted in Exhibit J Article 3("Termination") of this contract based on Contractor breach."

"Liquidated damages for delay and Facility Guarantee (process and performance guarantee) are the only remedies available to the Owner, all other claims shall be excluded, and cumulatively capped at 10% of the Contract Price." (p. 46 of 121).

56. As a result of the failure of the Project to reach the performance guaranties in the EPC Agreement, LRF is entitled to recover liquidated and/or other damages pursuant to the EPC Agreement.

57. Because BIOFerm has failed 1) to ever meet the Substantial Completion milestone and 2) to construct a Facility that processes any feedstock or produces any renewable natural gas, BioFerm's failure to perform under the EPC Agreement is total failure to construct an operational Facility, not a mere "failure of the Facility to meet the Guaranty" or "failure of the Facility to meet the Deadline." As a result, the liquidated damages referenced above are not the exclusive remedy for the breaches of the EPC Agreement by BioFerm.

### COUNT II
### INTENTIONAL MISREPRESENTATION AND FRAUD
### (BIOFERM AND NADEEM AFGHAN)

58. Plaintiff incorporates the foregoing allegations as if set forth fully herein.

59. On March 13, 2024, BIOFerm provided a lien waiver to LRF. A true and correct copy of the lien waiver is attached as **Exhibit 5** hereto.

60. On July 11, 2024, BIOFerm provided a lien waiver to LRF. The lien waiver was signed by signed by Defendant Nadeem Afghan, President and CEO of BIOFerm. A true and correct copy of the lien waiver is attached as **Exhibit 6** hereto.

61. BIOFerm submitted these lien waivers in support of, and to induce LRF to pay, BIOFerm's pay application No. 9 in the amount of $4,000,000.

62. Both the March 13, 2024 lien waiver and the July 11, 2024 lien waiver contained the following representations and warranty:

> The undersigned further warrants that, to date, it has paid all of its subcontractors, suppliers and materialmen for any and all completed labor, delivered materials and completed services rendered and completed in connection with the construction and improvement of the above-described project for services. Additionally, the undersigned agrees to indemnify and hold harmless the Owner from and against any and all claims, damages, losses and expenses, including but not limited to attorney's fees arising out of or resulting from any non-payment by the undersigned to any subcontractor, supplier, laborer or materialman to the above-described Project.

63. The representations and warranties contained in the March 13, 2024 and July 11, 2024 lien waivers, were false. As LRF discovered when it began receiving notices of non-payment following the September 9 tank rupture and in later communications with subcontractors, some subcontractor invoices had gone unpaid for as long as 9-11 months. Invoices. The following specific invoices from CEI predating the March and July lien waivers were not paid when the lien waivers falsely represented otherwise:

   (a) A CEI invoice dated December 31, 2023 was not paid until November 13, 2024;

   (b) CEI invoice dated February 29, 2024 was not paid until April 29, 2024;

   (c) A CEI invoice dated January 31, 2024 was paid on November 13, 2024;

   (d) A CEI invoice dated February 29, 2024 was paid on November 13, 2024; and

   (e) A CEI invoice dated March 31, 2024 was not paid until November 13, 2024.

64. Moreover, BIOFerm failed to pay the invoices even after the tank rupture and LRF's Notices of Breach.

65. Tellingly, all but one of these listed CEI invoices went unpaid by BIOFerm until the day *after* LRF terminated the EPC Agreement for cause, including based on BIOFerm's failure

to pay the subcontractors. This belated payment appears to be a clumsy attempt by BIOFerm to retroactively cure its failure to pay subcontractors and its false representation that subcontractors had been paid. The belated payment is also inconsistent with BIOFerm's position, in response to the Notice of Breach by LRF regarding the failure to pay subcontractors, that BIOFerm was not obligated to pay these subcontractors.

66. Even after this untimely payment, million more in invoices from other subcontractors for the Project have still not been paid by BIOFerm.

67. At the time that BIOFerm and Nadeem Afghan, signed and submitted the Lien Wavers, Nadeem Afghan and BioFerm knew that the representations therein made were false, and were made to induce LRF the accompanying pay applications.

68. LRF reasonably relied on the representations made in the lien wavers by authorizing payment of BIOFerm's pay application No. 9 and suffered damages as a result.

### COUNT III
### FRAUD BY CONCEALMENT
### (BIOFERM)

69. Plaintiff incorporate the foregoing allegations as if set forth fully herein.

70. As a result of the Third Amendment, BIOFerm had a duty to report "on a monthly basis" a summary statement of external costs incurred for the project and, on a bi-weekly basis a forward looking summary of any anticipated orders and purchases in excess of $100,000. BIOFerm failed to submit such reports.

71. LRF affirmatively alleges that BIOFerm intentionally withheld the reports required under the Third Amendment to conceal the ballooning costs that BIOFerm was incurring in connection with the Project.

72. Had BIOFerm timely disclosed the amounts that it was spending for Project costs as it was required to do from and after execution of the Third Amendment beginning in September,

2022, it would have been apparent to LRF that BIOFerm would be unable to complete the Project for an amount anywhere near the fixed contract price (including the claimed contingency payment of ▇▇▇▇▇▇).

73. LRF would then have taken steps to address the situation, including, but not limiting, terminating the EPC Agreement.

74. As a result of BIOFerm's concealment of these facts, LRF has been damaged in an amount to be shown at trial.

## COUNT IV- NEGLIGENCE
### (AGAINST BIOFERM, CEI, CALGARO CONSTRUCTION AND BALMORAL TANKS, LLC)

75. The allegations contained in the preceding paragraphs of the Complaint are repeated and incorporated herein by reference.

76. Each of these Defendants owed a duty of care to furnish labor and materials in a skillful, careful, diligent and workmanlike manner. At a minimum, Defendants had a duty to exercise the skill and knowledge normally possessed by members of its profession or trade in good standing in the community in which they operated.

77. Moreover, because BIOFerm represented to LRF that it and its subcontractors and suppliers had specialized skill or knowledge relating to the construction of the project at issue (or would engage subcontractors who possessed such specialized knowledge), these Defendants had a duty to LRF to exercise such skill and knowledge in connection with their work on the Project. These Defendants' work on the Project fell far below the standard of care.

78. As set forth above, and based upon LRF's initial investigation of the cause of the catastrophic rupture, LRF believes and avers that the rupture was caused by one or more of the

following deficiencies in the work performed by BIOFerm and its subcontractors, including Calgaro Construction:

1) BIOFerm's use of improper and out of specification bolts used to erect the tanks;

2) Use of impact wrenches used to install bolts, which wrenches were not calibrated properly, leading to both over-torquing and under-torquing of bolts;

3) Omission of nuts all together in certain locations; and

4) Improper application of mastic around certain bolts.

79. As set forth above, because of Calgaro Construction's lack of experience, Balmoral insisted on having its own representative present to oversee Calgaro's construction of the tanks. By doing so, Balmoral assumed the duty to ensure that Calgaro constructed the tanks in accordance with specifications and in a good and like manner.

80. CEI and Balmoral owed duties of care to LRF to oversee the erection of the tanks and insure that the tanks were being constructed in a good an workmanlike manner in accordance with Project plans.

81. BIOFerm, Balmoral and CEI knew or should have known of the shoddy workmanship being performed by Calgaro Construction on the Project, including the deficiencies listed in ¶ 77, above.

82. Each of these Defendants (BIOFerm, CEI, Calgaro Construction and Balmoral) breached their duties of care to Plaintiff in connection with the Project.

83. As a result of these breaches of care, LRF has suffered damages, including but not limited to, millions of dollars of damage to LRF's property and the Project.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request the following relief:

1. That the Court enter judgment in favor of Plaintiff against BIOFerm for its breach of the EPC Agreement, including:

    a. Damages Owed Pursuant to Section 3.1 of the EPC Agreement for the reasonable costs above the contract price that LRF has already incurred to complete the Project plus future costs that Plaintiff will incur in excess of the contract price

    b. An order directing BIOFerm to deliver the items it is required to deliver to LRF upon termination pursuant to Section 3.1 of the EPC Agreement.

    c. Liquidated damages for the delay pursuant to the EPC Agreement;

    d. Liquidated damages for performance guarantees under the EPC Agreement;

    Damages resulting from BIOFerm's failure to pay subcontractors; and

    e. Amounts dues for attorney's fees and other expenses due pursuant to the EPC Agreement.

2. That the Court enter judgment in favor of LRF against BIOFerm, Balmoral, Calgaro Construction and CEI for their negligence as described in the Complaint.

3. That the Court enter judgment in favor of Plaintiff against BIOFerm and Nadeem Afghan for damages incurred by Plaintiff as a result of these Defendants' fraud and intentional misrepresentations described in the Complaint.

4. That the Court enter an award of punitive or exemplary damages against BIOFerm and Nadeem Afghan for their intentional misrepresentations and concealments as described in the Complaint.

5. That the Court grant such other and further relief as the Court deems just, proper and equitable.

December 24, 2024.					Respectfully submitted,

							*/s/ Garry K. Grooms*
							Garry K. Grooms, Esq. (BPR No. 12647)
							Burr & Forman LLP
							222 Second Avenue South, Suite 2000
							Nashville, TN 37201
							Tel.: (615) 724-3229


							*/s/ Devin P. Lyon*
							Devin P. Lyon, Esq. (BPR No. 032232)
							dlyon@arnettbaker.com
							Paul E. Wehmeier, Esq. (BPR No. 030400)
							pwehmeier@arnettbaker.com
							Arnett, Baker, Draper and Hagood, LLP
							2300 First Horizon Plaza
							P.O. Box 300
							Knoxville, TN 37901-0300
							Tel.: (865) 546-7000